**STATE of Tennessee, Appellee,**

v.

**Phillip Ray GRIFFIS and Melissa Faith Rogers, Appellants.**

Court of Criminal Appeals of Tennessee, at Nashville.

April 30, 1997.

Permission to Appeal Denied by Supreme Court Dec. 22, 1997.

Dana C. Holloway, Knoxville, for Griffis.

Patrick A. Flynn, Columbia, for Rogers.

Charles W. Burson, Attorney General and Reporter, Kathy Morante, Assistant Attorney General, Nashville, Michael Bottoms, District Attorney General, Lawrenceburg, Stella L. Hargrove, Assistant District Attorney General, Robert C. Sanders, Assistant District Attorney General, Columbia, for Appellee.

## OPINION

JONES, Presiding Judge.

The appellants, Phillip Ray Griffis (Griffis) and Melissa Faith Rogers (Rogers), were convicted of raping a child, a Class A felony, and attempt to commit murder in the first degree, a Class A felony, by a jury of their peers. The trial court, finding the appellants

were standard offenders, sentenced both Griffis and Rogers to Range I sentences consisting of a fine of $50,000 and confinement for twenty-five (25) years in the Department of Correction for each offense. The trial court ordered that the sentences are to be served consecutively. The effective sentence received by both Griffis and Rogers was a fine of $100,000 and confinement in the Department of Correction for fifty (50) years.[1]

Griffis presents a total of thirteen issues for review. Rogers presents eleven issues for review. Both parties contend that the evidence is insufficient, as a matter of law, to support their respective convictions for rape of a child and attempt to commit murder in the first degree. They also contend that (a) they were convicted upon the uncorroborated testimony of a co-conspirator and co-defendant, (b) the child victim, P.M.,[2] was not qualified to testify as a witness at the trial, (c) the trial court abused its discretion by (1) refusing to permit the appellants to have P.M. examined by an independent psychologist, (2) admitting photographs of the victim, (3) denying their motion for a bill of particulars, and (4) denying their respective motions for a severance. They also contend (d) there was prosecutorial misconduct during summation and (e) their sentences are excessive. Additionally, Griffis contends the trial court abused its discretion by refusing to continue the trial and denying his motion for change of venue. Finally, they contend the indictments returned by the grand jury failed to state a crime.

The judgment of the trial court is affirmed.

Griffis and Rogers lived in a Birmingham, Alabama apartment complex managed by Cathy Mitchell's (Mitchell) common law husband. When Mitchell's husband died, Griffis and Rogers convinced Mitchell to live with them. They, along with Mitchell's daughters, P.M. and B.M., lived in a Birmingham motel for a short period of time. Later, Griffis's sister came to Birmingham and

---

1. Cathy Mitchell, a co-defendant, entered a plea of guilty to attempt to commit murder in the first degree. The trial court sentenced Mitchell to confinement for twenty-three (23) years in the Department of Correction.

2. It is the policy of this Court to use the initials of minors who have been the victim of a sex-related case.

drove Griffis, Rogers, Mitchell, and the two children to Columbia, Tennessee. They lived with Griffis's parents for a short period of time. The two children apparently annoyed Griffis's parents. Mitchell and the children moved to a motel room that was paid for by a church. Later, Mitchell and the children moved to the Family Life Mission, a family shelter, in Nashville, Tennessee.

Mitchell and her children lived at the mission for approximately three weeks. On October 12, 1993, Griffis and Rogers went to the mission and convinced Mitchell and her children to leave the mission. That night they slept in Griffis's automobile. On October 13, 1993, Rogers leased a house trailer, and everyone moved into the trailer that day. Everyone lived in the trailer during the period in question. The trailer became a torture chamber for P.M., who turned four years of age on November 12, 1993.

Mitchell began having disciplinary problems with P.M. shortly after Halloween. P.M.'s conduct apparently interfered with Griffis's and Rogers's tranquility and ability to relax. Both Griffis and Rogers told Mitchell that they would like to cremate P.M. What occurred in the ensuing weeks was a concerted effort to kill her.

When P.M. accidentally wet the bed one night, Griffis took the sheets, placed them in the bathtub, and made the child sleep in the tub. For a while, Griffis and Rogers required her to sleep on the floor at the foot of their bed. Later, Griffis brought a large cardboard box home from his place of employment. He cut a door in the box. P.M. was required to sleep inside the box until the abuse was uncovered. Roughly six weeks after the group moved into the trailer, P.M. was liberated from the torture chamber.

Griffis obtained a wooden board from his place of employment, placed duct tape around one end of the board, and called it a "paddle." P.M. was continually beaten by Griffis and Rogers with their hands, a belt, and the paddle. On one occasion, Griffis placed the child on the edge of the sofa nude, spread her legs, and began striking her with the paddle. He hit her every place he could, including the vaginal area of her body. The beating lasted for approximately thirty minutes.

When the hot water heater at the trailer malfunctioned before P.M.'s bath, Rogers boiled water on the stove. She took several pans of water into the bathroom and poured the scalding water on P.M.'s body. Rogers told Mitchell that she dented one of the pans when she hit the girl on the head. On another occasion, Griffis and Rogers took turns holding the child's body against a heater in the bathroom. P.M. suffered severe burns as a result of this conduct. Her fingers, palms, and forehead were covered with cigarette burns.

On Thanksgiving Day, Griffis took Rogers, Mitchell, and B.M. to his parents' home for lunch. He took P.M. with him to the vacant factory where he worked as a security guard. When he returned that evening to eat supper, he was asked about P.M. He told those present she was in the car asleep, and "if anybody woke her (P.M.) up, he'd cut the damn bitch's throat." Griffis was referring to P.M.'s throat. Neither Griffis nor Rogers wanted anyone to see P.M. due to her physical condition.

While living at the trailer, Mitchell saw Rogers penetrate P.M.'s vagina with her fingers. Shortly thereafter Griffis penetrated P.M.'s vagina with his sexual organ. On occasion Rogers took baths with the child. It was developed through the child's testimony that Rogers had placed her fingers inside P.M.'s vagina when they took a bath together.

On the morning of November 26, 1993, the day after Thanksgiving, Griffis developed chest pains. His mother took him and Rogers to a local hospital. When he was released, he and Rogers went to the trailer and then returned to his parents' residence about 8 p.m. While Griffis and Rogers were gone, Mitchell confided to a neighbor, Joyce F. Williams, about the abuse. Mrs. Williams offered to help Mitchell find a place to live. In the meantime, Mrs. Williams asked Mitchell if P.M. could spend the night with her grandchild.

Mitchell permitted P.M. to go with Mrs. Williams. While at the Williams's trailer,

Mrs. Williams, her husband, and her son saw the bruises and burns on the child's body. Mrs. Williams called the police to report the abuse. In the interim, Griffis and Rogers returned to the trailer around 11 p.m. They asked Mitchell where the child had gone. Mitchell told them that P.M. had gone to Mrs. Williams's trailer to spend the night. Rogers ordered Mitchell to go to the Williams's trailer and get her. Mitchell complied. Rogers also went to the Williams's trailer and told Mrs. Williams that Mitchell had inflicted the bruises and burns.

The police came in response to the call. An officer testified that P.M. was semi-conscious when he arrived. An ambulance was called and the girl was taken to the hospital immediately.

The doctor on duty at the emergency room testified the child was within twenty minutes of death. Her fingers, feet, and lips had turned blue. An oxygen line was placed inside P.M.'s lung as she was not receiving sufficient oxygen. The doctor further testified the child's back was covered with bruises. There were multiple burns to the palms of the hands, and each finger had been burned. She had burns of various ages to the lower abdomen, buttocks, legs, and genital area of her body. She had "an extensive burn" on her forehead. He said these were second-degree burns. She also had pneumonia and a collapsed lung. According to the doctor, the child's condition was above critical, and her chances of survival were slim. A pediatric specialist also opined he did not believe that the girl would survive.

If P.M. was to live, she needed to be placed in a pediatric intensive care unit. Vanderbilt University Medical Center in Nashville is the only hospital in Middle Tennessee with such a facility. The weather prohibited transportation by helicopter. She was transported by ambulance to Vanderbilt Medical Center and was accompanied by several hospital personnel. P.M. was treated at Vanderbilt. However, the doctors had to

wait until she was better before treating her for the severe burns. A pediatric surgeon at Vanderbilt testified she was "in danger of dying in the very near future if things did not improve." She did improve. Her burns were debrided.[3] Later, she received skin grafts. She survived to testify at Griffis's and Rogers's trial.

The child testified Griffis and Rogers beat and burned her. They burned her with cigarettes. She confirmed she was required to sleep in the bathtub and a cardboard box. She testified Griffis beat her with the paddle, and he hung her on a hook on the back of a door. She remembered being placed in a bed unclothed. Rogers placed her fingers in her vagina while she was on the bed and when they took baths together. While on the bed, Griffis removed his clothes. Pointing to her genitals, she confirmed Griffis penetrated her there with his sexual organ.

## I.

Griffis and Rogers contend the state failed to prove penetration, an element of rape of a child. They also contend the state failed to prove intent, premeditation, and deliberation, elements of attempt to commit murder in the first degree.

## A.

When an accused challenges the sufficiency of the convicting evidence, this Court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt."[4] This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.[5]

In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence.[6] Nor may this Court substitute its inferences for those drawn by

---

**3.** The process of debriding includes the removal of dead skin which is a source for bacterial infection.

**4.** Tenn.R.App.P. 13(e).

**5.** *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim.App.), *per. app. denied* (Tenn.1990).

**6.** *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978).

the trier of fact from circumstantial evidence.[7] To the contrary, this Court is required to afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.[8]

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence are resolved by the trier of fact, not this Court.[9] In *State v. Grace*,[10] the Supreme Court said: "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."

Since a verdict of guilt removes the presumption of innocence,[11] the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact.[12] This Court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record and the inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the accused guilty beyond a reasonable doubt.[13]

### B.

Griffis and Rogers argue they cannot be convicted of raping a child because the state failed to prove penetration. This Court, like the trial court, finds this element of the offense was established beyond a reasonable doubt.

Mitchell testified she walked into Griffis and Rogers's bedroom and saw P.M. lying on the bed nude. Rogers was placing her fingers inside P.M.'s vagina. Griffis had his pants down and his reproductive organ in P.M.'s face. He had P.M. touch his reproductive organ. Later, Griffis got into a position to penetrate P.M. The child testified Griffis had his clothes off and Griffis hurt her in the vaginal area of her body. She also testified Rogers digitally penetrated her when she took a bath with her.[14]

A medical doctor, a specialist in detecting child sexual abuse, testified he found a "rather large" fissure at P.M.'s anal opening. He stated the tearing was the result of one of two things—a "vigorous stretching of the anal area" or a "sharp lacerating type of injury with a sharp object." He concluded "[r]ectal penetration is in the differential for causing this injury." Such an injury is consistent with penetration. The extent of the injury would depend upon the depth of the penetration. According to the doctor, a small amount of anal penetration by a male's reproductive organ would hurt a four-year-old child, and the child may perceive she was being vaginally penetrated because the child could not tell the difference between anal penetration and vaginal penetration. This Court has affirmed convictions based upon slight penetration.[15]

While the hymen was intact, the doctor testified "[t]here can sometimes be vaginal penetration without injuries." However, the doctor concluded there was a "normal genital examination" in this case.

In this jurisdiction, "sexual penetration" is defined as:

> sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion,

---

7. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956).

8. *State v. .Herrod*, 754 S.W.2d 627, 632 (Tenn. Crim.App.), *per. app. denied* (Tenn.1988).

9. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim.App.), *per. app. denied* (Tenn.1987).

10. 493 S.W.2d 474, 476 (Tenn.1973).

11. *Grace*, 493 S.W.2d at 476.

12. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

13. *Matthews*, 805 S.W.2d at 780.

14. *See Jackie Lee Reagan v. State*, Cumberland County No. 35, 1986 WL 13063 (Tenn.Crim.App., Nashville, November 19, 1986).

15. *See State v. Larry Dale Taylor*, Decatur County No. 02–C–01–9412–CC–00272, 1995 WL 480617 (Tenn.Crim.App., Jackson, August 16, 1995), *per. app. denied* (Tenn.1996); *State v. James Newsom*, Lawrence County No. 86–194–111, 1987 WL 5540 (Tenn.Crim.App., Nashville, January 23, 1987).

however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required.[16]

The evidence in this case is sufficient to support a finding by a rational trier of fact that Griffis and Rogers penetrated the rectal and vaginal openings of P.M.'s body beyond a reasonable doubt.[17]

### C.

■ Griffis and Rogers argue the state failed to prove intent, premeditation, and deliberation, essential elements of attempt to commit murder in the first degree. This Court, like the trial court, concludes these elements were proven beyond a reasonable doubt.

Both Griffis and Rogers stated they wanted to cremate the child. The evidence in this case supports the state's theory that Griffis and Rogers intentionally, premeditatedly, and deliberately attempted to kill her. When she arrived at the hospital, she was twenty minutes from death. All of the doctors who saw her questioned whether she would survive. They did not know she had a strong constitution—she was a survivor.

Between November 1, 1993, and November 26, 1993, Griffis and Rogers commenced and methodically carried out a course of action any rational human being would know, if continued, would cause the child to die. They beat the child with their hands, a belt, and a piece of wood they called a paddle. Rogers poured scalding water over the child's body. Griffis and Rogers took turns holding her against a heater in the bathroom. They then poured alcohol and peroxide over her fresh burns. It is also evident they burned her forehead, hands, and fingers with cigarettes. On November 26, 1993, the child could not walk under her own power. A police officer described her as being semiconscious. The emergency room doctor testified it was necessary to place a tube in her

lung to provide oxygen. Otherwise, she would have died in twenty minutes.

The child testified Griffis and Rogers burned her. She also verified Griffis and Rogers beat her, and the beatings were with a paddle. P.M. also verified Griffis and Rogers burned her "bottom."

Two neighbors and five doctors saw and described the injuries the girl sustained at the hands of Griffis and Rogers. There were burns to both sides of her hands and each finger. She had "an extensive burn" to her forehead. She was bruised from her waist to her neck. She was also bruised on the thighs and lower extremities. She was severely burned on her "bottom." This required skin grafts. In addition, she was suffering from pneumonia.

On Thanksgiving Day, the appellants would not let P.M. go to Griffis's parents because of the severe nature of the injuries. She went with Griffis to his place of employment. When he returned to his parents' home that evening, he left her in the car. When those present asked about P.M., he told them "if any body woke her [P.M.] up he'd cut the damn bitch's throat."

The evidence in this case is sufficient to support a finding by a rational trier of fact Griffis and Rogers intentionally, premeditatedly, and deliberately attempted to kill the child beyond a reasonable doubt.[18]

This issue is without merit.

### D.

■ Griffis and Rogers contend they cannot be convicted upon the uncorroborated testimony of Mitchell. They argue Mitchell was a co-conspirator since she entered a plea of guilty to attempting to commit murder in the first degree. The record reflects she did not enter a plea of guilty to the rape of a child.

■ It is a well-settled rule of law that an accused cannot be convicted of a felony on the uncorroborated testimony of an accom-

---

16. Tenn.Code Ann. § 39–13–501(7).

17. Tenn.R.App.P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

18. Tenn.R.App.P. 13(e); *Jackson v. Virginia, supra*.

plice.[19] A person is an accomplice if he or she knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument.[20] A child can be an accomplice in a sex-related case.[21] When a child is deemed an accomplice, the testimony of the child, like an adult, must be corroborated.[22]

The question of who determines whether a witness is an accomplice depends upon the evidence introduced during the course of a trial.[23] When the undisputed evidence clearly establishes the witness is an accomplice as a matter of law, the trial court, not the jury, must decide the issue.[24] On the other hand, if the evidence adduced at trial is unclear, conflicts, or is subject to different inferences, the jury, as the trier of fact, is to decide if the witness was an accomplice.[25] If the jury finds the witness was an accomplice, the jury must decide whether the evidence adduced was sufficient to corroborate the witness's testimony.[26]

The appellate courts have addressed the nature, quality, and sufficiency of the evidence required to corroborate the testimony of an accomplice on numerous occasions. In *Sherrill v. State*,[27] the supreme court said:

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of

**19.** *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *State v. Henley*, 774 S.W.2d 908, 913 (Tenn.1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3291, 111 L.Ed.2d 800 (1990); *Monts v. State*, 214 Tenn. 171, 191, 379 S.W.2d 34, 43 (1964); *Boulton v. State*, 214 Tenn. 94, 96, 377 S.W.2d 936, 938 (1964); *Scott v. State*, 207 Tenn. 151, 155, 338 S.W.2d 581, 583 (1960); *Sherrill v. State*, 204 Tenn. 427, 433, 321 S.W.2d 811, 814 (1959); *Shelly v. State*, 95 Tenn. 152, 155, 31 S.W. 492, 493 (1895); *State v. McKnight*, 900 S.W.2d 36, 47 (Tenn.Crim.App. 1994), *per. app. denied* (Tenn.1995); *State v. Adkisson*, 899 S.W.2d 626, 643 (Tenn.Crim.App. 1994); *Bethany v. State*, 565 S.W.2d 900, 903 (Tenn.Crim.App.), *cert. denied* (Tenn.1978); *Prince v. State*, 529 S.W.2d 729, 731 (Tenn.Crim. App.), *cert. denied* (Tenn.1975); *Gable v. State*, 519 S.W.2d 83, 84 (Tenn.Crim.App.1974), *cert. denied* (Tenn.1975); *Henley v. State*, 489 S.W.2d 53, 56 (Tenn.Crim.App.), *cert. denied* (Tenn. 1972); *Scola v. State*, 4 Tenn.Crim.App. 485, 489, 474 S.W.2d 144, 145, *cert. denied* (Tenn.1971).

**20.** *See Monts*, 214 Tenn. at 191, 379 S.W.2d at 43; *Clapp v. State*, 94 Tenn. 186, 194, 30 S.W. 214, 216 (1895); *Adkisson*, 899 S.W.2d at 643; *State v. Roe*, 612 S.W.2d 192, 194 (Tenn.Crim. App.1980), *per. app. denied* (Tenn.1981); *Bethany*, 565 S.W.2d at 903; *Conner v. State*, 531 S.W.2d 119, 123 (Tenn.Crim.App.), *cert. denied* (Tenn.1975); *Smith v. State*, 525 S.W.2d 674, 676 (Tenn.Crim.App.1974), *cert. denied* (Tenn. 1975); *Marshall v. State*, 497 S.W.2d 761, 764 (Tenn.Crim.App.), *cert. denied* (Tenn.1973); *Moore v. State*, 1 Tenn.Crim.App. 190, 194–95, 432 S.W.2d 684, 686–87, *cert. denied* (Tenn. 1968).

**21.** *See Boulton*, 214 Tenn. at 96, 377 S.W.2d at 937 (boy fourteen years of age an accomplice); *Scott*, 207 Tenn. at 155, 338 S.W.2d at 583 (teenager); *Sherrill*, 204 Tenn. at 432–33, 321 S.W.2d at 814 (children ten and eleven years of age accomplices); *Henley*, 489 S.W.2d at 56 (fifteen-year old an accomplice); *Underwood v. State*, 3 Tenn.Crim.App. 583, 587, 465 S.W.2d 884, 886 (1970), *cert. denied* (Tenn.1971) (sixteen-year-old an accomplice); *Britt v. State*, 1 Tenn.Crim.App. 768, 772, 450 S.W.2d 48, 50 (1969), *cert. denied* (Tenn.1970) (a stepdaughter between the ages of nine and sixteen who engaged in sexual intercourse with a stepfather an accomplice).

**22.** *Boulton*, 214 Tenn. at 96–97, 377 S.W.2d at 938; *Scott*, 207 Tenn. at 158, 338 S.W.2d at 584; *Sherrill v. State*, 204 Tenn. at 433, 321 S.W.2d at 814–15; *Henley v. State*, 489 S.W.2d 53, 56 (Tenn.Crim.App. 1972); *Underwood*, 3 Tenn. Crim.App. at 587, 465 S.W.2d at 886; *Britt*, 1 Tenn.Crim.App. at 773, 450 S.W.2d at 50.

**23.** *Bethany*, 565 S.W.2d at 903.

**24.** *Ripley v. State*, 189 Tenn. 681, 687, 227 S.W.2d 26, 29 (1950); *Bethany*, 565 S.W.2d at 903; *Smith*, 525 S.W.2d at 676; *Abbott v. State*, 508 S.W.2d 801, 803 (Tenn.Crim.App.), *cert. denied* (Tenn.1974).

**25.** *Ripley*, 189 Tenn. at 687, 227 S.W.2d at 28–29; *Bethany*, 565 S.W.2d at 903; *Bright v. State*, 563 S.W.2d 908, 910 (Tenn.Crim.App.1977), *cert. denied* (Tenn.1978); *Conner*, 531 S.W.2d at 123.

**26.** *Ripley*, 189 Tenn. at 687, 227 S.W.2d at 28–29.

**27.** 204 Tenn. 427, 321 S.W.2d 811 (1959).

any testimony of the accomplice. The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.

This corroborative evidence need not be direct evidence, but the rule of corroboration is satisfied even though the evidence is entirely circumstantial. The corroboration need not of itself be adequate to support a conviction, but it must be sufficient to meet the requirements of the rule and it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.[28]

In short, the evidence must confirm in some manner that (a) a crime has been committed and (b) the accused committed the crime.[29]

The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence.[30] The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplice's testimony[31] nor is it required to extend to every portion of the accomplice's testimony.[32] To the contrary, only slight circumstances are required to corroborate an accomplice's testimony.[33] The corroborating evidence is sufficient if it connects the accused with the crime in question.[34]

Evidence which merely casts a suspicion on the accused or establishes he or she had an opportunity to commit the crime in question is inadequate to corroborate an accomplice's testimony.[35] Also, evidence that the accused was present at the situs of the crime and had the opportunity to commit the crime is not sufficient.[36]

In this case, Mitchell saw Rogers digitally penetrate the victim. She also saw Griffis with his sexual organ near the victim's face, and, subsequently, position himself to penetrate the victim with his sexual organ. Although Mitchell was not an accomplice to the child's rape by Rogers and Griffis, her testimony was corroborated by the victim and a medical doctor whose findings were consistent with the penetration of the victim.

In the attempt to commit murder in the first degree, Mitchell was an accomplice as a matter of law. However, her testimony was corroborated by the testimony of the victim, the medical personnel who saw the victim in the local emergency room, and the doctors who treated the victim at Vanderbilt University Medical Center. The victim was not an accomplice. She related what Griffis and Rogers did to her. A neighbor saw the victim's physical condition and called police. A police officer found the victim in a semiconscious state. The doctor at the local hospital found the victim to be within minutes of death. The Vanderbilt Medical Center doctors also related the seriousness of the victim's injuries. The medical personnel felt the victim would die from the injuries inflicted. In summary, Mitchell's testimony was fully corroborated by this evidence.

This issue is without merit.

## II.

After the briefs were filed in this cause, Griffis and Rogers filed motions to consider

28. 204 Tenn. at 435, 321 S.W.2d at 815.

29. *Boulton,* 214 Tenn. at 99, 377 S.W.2d at 939; see *State v. Sparks,* 727 S.W.2d 480, 483 (Tenn. 1987); *Mathis v. State,* 590 S.W.2d 449, 455 (Tenn.1979); *Bethany,* 565 S.W.2d at 903; *Henley,* 489 S.W.2d at 56.

30. *Sparks,* 727 S.W.2d at 483; *Henley,* 489 S.W.2d at 56.

31. *Sparks,* 727 S.W.2d at 483.

32. *Stanley v. State,* 189 Tenn. 110, 116–17, 222 S.W.2d 384, 387 (1949).

33. *Sparks,* 727 S.W.2d at 483; *Stanley,* 189 Tenn. at 116–17, 222 S.W.2d at 387; *Bolton v. State,* 591 S.W.2d 446, 448 (Tenn.Crim.App.), *per. app. denied* (Tenn.1979); *Bethany,* 565 S.W.2d at 904; *Boaz v. State,* 537 S.W.2d 716, 718 (Tenn.Crim. App.1975), *cert. denied* (Tenn.1976).

34. *Stanley,* 189 Tenn. at 117, 222 S.W.2d at 387.

35. *Boulton,* 214 Tenn. at 99, 377 S.W.2d at 939.

36. *Mathis,* 590 S.W.2d at 454.

post-judgment facts pursuant to Rule 14, Tennessee Rules of Appellate Procedure. The motions asked this Court to consider its decision in *State v. Roger Dale Hill, Sr.*[37] Since the "facts" the appellants wanted this court to consider do not fall within the purview of Rule 14, the motion was denied. However, since the issue raised is jurisdictional, this Court is required, as a matter of law, to consider the issue.[38]

Griffis and Rogers contend the rape of a child count in their respective indictments is defective, the proceedings held pursuant to the indictments are void, and this Court should reverse these convictions and dismiss the prosecution against them. Their arguments are predicated upon this Court's decision in *Hill*.

Count III of the indictment charging Griffis with the offense of rape of a child alleges:

> And the Grand Jurors aforesaid, upon their oath aforesaid, do further present that on or about the 13th day of October, 1993 through November 26, 1993, in the State of Tennessee and County of Maury, that Phillip Ray Griffis, before the finding of this indictment, did unlawfully sexually penetrate [PM, the victim], a child less than thirteen (13) years of age, in violation of T.C.A. 39-13-522, all of which is against the peace and dignity of the State of Tennessee.

Count II charging Rogers with the offense of rape of a child alleges:

> And the Grand Jurors aforesaid, upon their oath aforesaid, do further present that on or about the 13th day of October, 1993 through November 26, 1993, in the State of Tennessee and County of Maury, that Melissa Faith Rogers, before the finding of this indictment, did unlawfully sexually penetrate [PM, the victim], a child less

than thirteen (13) years of age, in violation of *Tennessee Code Annotated* 39-13-522.

The question this Court must determine is whether the allegations contained in these respective counts of the two indictments are sufficient to charge the offense of rape of a child.

Since Griffis and Rogers filed their respective motions, a panel of this Court has ruled contrary to the holding in *Hill*.[39] In *State v. Dison*, this Court held an indictment almost identical to the counts in question sufficiently alleged the offense of rape of a child. This Court is of the opinion the counts in question sufficiently allege a crime, and, therefore, are perfectly valid.

### A.

The Tennessee Constitution requires an indictment or presentment to state "the nature and cause of the accusation."[40] The statutes of this jurisdiction also govern the allegations which must be contained in an indictment.[41] The applicable statute, Tenn. Code Ann. § 40-13-202 states:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment; and in no case are such words as "force and arms" or "contrary to the form of the statute" necessary.

The supreme court has said the constitution and statute require an indictment or presentment to "contain a complete description of such facts and circumstances as will constitute the crime."[42]

While the description of the offense contained in an indictment or present-

---

**37.** Wayne County No. 01-C-01-9508-CC-00267, 1996 WL 346941 (Tenn.Crim.App., Nashville, June 20, 1996), *per. app. granted* (January 9, 1997).

**38.** Tenn.R.App.P. 13(b); Tenn.R.Crim.P. 52(b).

**39.** *State v. James Dison*, Sevier County No. 03-C-01-9602-CC-00051, 1997 WL 36844 (Tenn.Crim. App., Knoxville, January 31, 1997), *application*

*for permission to appeal pending* (March 14, 1997).

**40.** Tenn. Const. art. 1, § 9.

**41.** Tenn.Code Ann. § 40-13-202.

**42.** *Tipton v. State*, 160 Tenn. 664, 670, 28 S.W.2d 635, 636 (1930) (citations omitted).

ment "must be sufficient in distinctness, certainty, and precision to enable the accused to know what offense he is charged with and to understand the special nature of the charge he is called upon to answer,[43] it is not necessary to amplify and encumber the charge by circumstantial detail and minute description."[44] As a general rule, it is sufficient to state the offense charged in the words of the statute,[45] or words which are the equivalent to the words contained in the statute.[46]

▉▉▉ A court must consider several factors when determining the sufficiency of an indictment or presentment. As this Court said in *State v. Tate:*

> [The court] must consider whether (a) the charging instrument contains the elements of the offense which is intended to be charged; (b) the charging instrument sufficiently apprises the accused of the offense he is called upon to defend; (c) the trial court knows to what offense it must apply the judgment; and (d) the accused knows with accuracy to what extent he may plead a former acquittal or conviction in a subsequent prosecution for the same offense.[47]

This Court must now consider whether the counts of the indictment in this case meet this criteria.

### B.

▉▉▉ Each count in question tracks the language of the applicable statute. Tennessee Code Annotated § 39–13–522 states: "Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Based upon the decisions interpreting Article I, Section 9 of the Tennessee Constitution and Tenn.Code Ann. § 40–13–202, the allegations contained in the counts in question are sufficient and meet the criteria set forth in *Tate.*

The counts in question contain the elements of the offense of rape of a child. The counts sufficiently apprise Griffis and Rogers of the offense they were required to defend. The trial court clearly knew the precise offense to apply the judgment to the verdict of the jury. If indicted for a similar offense in the future, Griffis and Rogers know the precise extent they may plead a former conviction.

The Tennessee Sentencing Reform Act of 1989 does not require an indictment or presentment to allege the *mens rea* or culpable mental state unless the language of the statute specifically provides the *mens rea* is an element of the offense.[48] Consequently, the failure to allege a *mens rea* or culpable mental state in the two counts in this case did not invalidate these two counts. The statute proscribing the offense does not make a specific culpable mental state an element of the offense of rape of a child.

The fact the statute fails to make a specific *mens rea* or culpable mental state an element of the offense does not absolve the State of Tennessee from proving the requisite culpable mental state in such cases. The state has the burden of proving the requisite culpable mental state regardless of whether the statute does or does not set forth a specific culpable mental state.

This issue is without merit.

### III.

▉▉▉ Griffis and Rogers contend the trial court committed error of prejudicial dimensions by allowing the young victim to testify as a prosecution witness. They argue the victim was not competent to testify due to her inability to distinguish between a true statement and an untrue statement. They cite the victim's admission to the trial court

---

43. *Church v. State,* 206 Tenn. 336, 358, 333 S.W.2d 799, 809 (1960).

44. *Jordan v. State,* 156 Tenn. 509, 514, 3 S.W.2d 159, 160 (1928) (citations omitted).

45. *State v. Overton,* 193 Tenn. 171, 174, 245 S.W.2d 188, 189 (1951); *Stanfield v. State,* 181 Tenn. 428, 432, 181 S.W.2d 617, 618 (1944); *Jordan,* 156 Tenn. at 514, 3 S.W.2d at 160; *State*

*v. Tate,* 912 S.W.2d 785, 789 (Tenn.Crim.App. 1995).

46. *Coke v. State,* 208 Tenn. 248, 250–51, 345 S.W.2d 673, 674 (1961); *Starks v. State,* 66 Tenn. 64, 66 (Tenn.1872). *See Tate,* 912 S.W.2d at 789.

47. 912 S.W.2d at 789.

48. Tenn.Code Ann. §§ 39–11–301 and –302.

that she had told untruths in the past to support their respective arguments.

The Tennessee Rules of Evidence provide that "[e]very person is presumed competent to be a witness" unless a rule or statute provides to the contrary.[49] However, the evidence must reveal "the witness has personal knowledge" of the subject matter,[50] and the witness must declare he or she will testify truthfully by oath or affirmation.[51]

■■■ The question of whether a child-victim is competent to testify and meets the aforementioned criteria rests within the sound discretion of the trial court.[52] The pivotal issue in the court's determination is the child-victim's ability to understand the necessity of telling the truth while testifying during the course of the trial.[53]

■■■ The presumption favoring a child-victim's competence to testify may be rebutted by the accused.[54] Once the trial court has ruled the child-victim is competent to testify, the accused has the burden of illustrating why the child was not competent.

In this case, the trial court was satisfied the child understood the difference between a true statement and an untrue statement as well as the importance of telling the truth during the course of the trial. Although the child-victim admitted she told untruths in the past, she also acknowledged it was wrong and she had been punished for telling an untruth. The child-victim told the trial court she was required to tell the truth in court and she promised the trial court she would do so. The child-victim took an oath and the

trial court found she was a competent witness.

The testimony of the child-victim was cogent and responsive to the questions propounded to her. In addition, the child-victim illustrated she had vast personal knowledge of what occurred. This was expected since she was the object of the sexual and physical abuse administered by Griffis and Rogers.

This issue is without merit.

## IV.

On June 16, 1994, the appellants filed a joint motion entitled "Motion to Compel Psychological/and or Psychiatric Testing of [PM], (the Alleged Victim) to Determine Her Capacity to Testify." The record does not reflect when this motion was heard. However, there is an order in the record denying the motion.[55] The order was entered July 6, 1994. The order stated in part:

ORDERED that the Defendants may consult with and retain a psychologist or psychiatrist as a potential expert witness in this case and that the State of Tennessee shall pay all costs associated with such services, including charges for time spent both in consultation and in giving testimony.

■■■ When a party seeks appellate review of an issue, the party has a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issue presented for review.[56] When the record is incomplete and does not contain a transcript of the proceedings relevant to the issue presented for review, the

---

**49.** Tenn.R.Evid. 601. *See State v. Hallock,* 875 S.W.2d 285, 293 (Tenn.Crim.App.1993), *per. app. denied* (Tenn.1994).

**50.** Tenn.R.Evid. 602.

**51.** Tenn.R.Evid. 603.

**52.** *Hallock,* 875 S.W.2d at 293 (citing *State v. Ballard,* 855 S.W.2d 557 (Tenn.1993)).

**53.** *Ballard,* 855 S.W.2d at 560.

**54.** *State v. Campbell,* 904 S.W.2d 608, 612 (Tenn. Crim.App.1995).

**55.** An assistant district attorney general said during the hearing on the motion for a continuance

the hearing was conducted on July 1, 1994. Defense counsel for Griffis also stated the hearing was held on July 1, 1994.

**56.** *State v. Ballard,* 855 S.W.2d 557, 560–61 (Tenn.1993); *State v. Zirkle,* 910 S.W.2d 874, 883 (Tenn.Crim.App.), *per. app. denied* (Tenn.1995); *State v. Richardson,* 875 S.W.2d 671, 674 (Tenn. Crim.App.1993), *per. app. denied* (Tenn.1994); *State v. Banes,* 874 S.W.2d 73, 82 (Tenn.Crim. App.1993), *per. app. denied* (Tenn.1994); *State v. Oody,* 823 S.W.2d 554, 558–59 (Tenn.Crim.App.), *per. app. denied* (Tenn.1991); *State v. Roberts,* 755 S.W.2d 833, 836 (Tenn.Crim.App.), *per. app. denied* (Tenn.1988).

appellate court is precluded from considering the issue.[57] Instead, the appellate court must conclusively presume the ruling of the trial court on the motion was correct.[58]

This issue is without merit.

## V.

■ On July 8, 1994 and July 11, 1994, a motion for continuance was filed in the cause by Griffis and Rogers. The purpose of the motion was to seek additional time to confer with an expert from Nashville whom counsel had consulted as a potential expert witness. According to counsel, the expert did not have time to discuss the matter with counsel between July 1, 1994, and the trial date, July 26, 1994. Apparently no effort was made to obtain such an expert from Maury County. The motion was presented to the trial court on July 12, 1994. The trial court denied the motion for continuance.

The trial court subsequently ruled one count of each indictment was defective. The trial court continued the case until August 15, 1994. The record reflects other motions were made by the parties early in August.

The motion for continuance did not have an affidavit attached explaining what, if anything, the appellants sought to accomplish with the expert witness. The record is devoid of evidence or statements of counsel as to what, if any, effect the continuance had upon counsel's ability to consult with an expert. Nor does the record indicate what, if any thing, the expert could have done to assist in their respective defenses.

During the motion for a new trial, counsel addressed why an expert was necessary. Counsel for Griffis stated:

[A] short time before trial, we had moved to have the Court appoint us an expert to examine the four year old child.... The purpose of that examination was twofold basically. Number one, we needed to find out if the child was competent to testify

and needed expert proof on that issue. Number two, it was necessary in this case that we have expert proof and be allowed to develop expert proof on the issue of whether or not this child's recollection of the events, the events that she ultimately testified to, were actually based on her memory or if they were based on things that she had been told, or that she had heard, or that she had picked up in subsequent interviews or interrogations.

The trial court, an assistant district attorney general, and defense counsel questioned the child-victim extensively. The child-witness was examined at length by the assistant district attorney general and defense counsel during the course of her testimony. It is clear on the face of the record the child-victim was competent to testify, and she was able to relate what Griffis and Rogers did to her during the ordeal she had to endure.

Whether a motion for continuance should be granted is a matter entrusted to the sound discretion of the trial court.[59] This Court will not interfere with the trial court's exercise of this discretion unless the record reflects an abuse of this discretion.[60] Here, Griffis, who was the only one to raise this issue on appeal, failed to establish the trial court abused its discretion in denying the motion for continuance. Moreover, the record is silent on what, if any, prejudice Griffis incurred as a result of the denial of the motion. This Court is not entitled to speculate in this regard.

This issue is without merit.

## VI.

Photographs depicting the injuries sustained by the victim were introduced through a police officer and two doctors. The appellants contend these photographs were "highly graphic," and the "prejudicial effect on the appellant outweighed their probative value."

57. *Ballard,* 855 S.W.2d at 560–61; *Zirkle,* 910 S.W.2d at 884; *Richardson,* 875 S.W.2d at 674; *Banes,* 874 S.W.2d at 82; *Roberts,* 755 S.W.2d at 836.

58. *Richardson,* 875 S.W.2d at 674; *Oody,* 823 S.W.2d at 558–59; *Roberts,* 755 S.W.2d at 836.

59. *State v. Dykes,* 803 S.W.2d 250, 257 (Tenn. Crim.App.), *per. app. denied* (Tenn.1990); *State v. Seals,* 735 S.W.2d 849, 853 (Tenn.Crim.App. 1987).

60. *Dykes,* 803 S.W.2d at 257; *Seals,* 735 S.W.2d at 853.

They complain the trial court permitted the introduction of these photographs "despite the Defendants' offer to stipulate that the victim sustained serious bodily injuries."

The purpose for introducing photographs into evidence is to assist the trier of fact. As a general rule, the introduction of photographs helps the trier of fact see for itself what is depicted in the photograph.

Before a photograph may be introduced into evidence, there must be a determination by the trial court (a) the matter depicted in the photograph is relevant to an issue which the jury must decide in determining the guilt of the accused, and (b) the probative value of the matter depicted in the photograph outweighs any prejudicial effect it may have upon the trier of fact.[61]

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[62] Although relevant evidence is generally admissible,[63] it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ... or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[64]

The fact relevant evidence is prejudicial does not mean the evidence must be excluded as a matter of law. As this Court said in *State v. Dulsworth:*[65] "Any evidence which tends to establish the guilt of an accused is highly prejudicial to the accused, but this does not mean that the evidence is inadmissible as a matter of law."[66] As Rule 403, Tennessee Rules of Evidence, states: the "danger of unfair prejudice" must "substan-

tially out weigh" the probative value of the evidence before the accused is entitled to have the evidence excluded.[67]

The determination of whether evidence is relevant, or, if relevant, should be excluded for one of the reasons set forth in Rule 403, addresses itself to the sound discretion of the trial court.[68] In deciding these issues, the trial court must consider, among other things, the questions of fact the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial.[69] If the trial court in the exercise of its discretion finds the evidence is relevant within the meaning of Rule 401, and the accused is not entitled to have the evidence excluded for one of the grounds set forth in Rule 403, this Court will not interfere with the exercise of this discretion unless it appears on the face of the record the trial court clearly abused its discretion.[70]

In this case, the State of Tennessee was required to establish beyond a reasonable doubt Griffis and Rogers attempted to kill the child-victim. There was no one act which could be established to prove this offense. To the contrary, there was a series of acts which led to the child-victim almost dying. The introduction of these photographs was necessary to show the trier of fact the multiple injuries the child-victim sustained at the hands of Griffis and Rogers. This was the only medium the state could utilize to communicate these injuries. In summary, the photographs were relevant and highly probative of an issue the trier of fact was required to decide. The probative value of

---

**61.** Tenn.R.Evid. 403; *State v. Banks,* 564 S.W.2d 947, 951 (Tenn.1978).

**62.** Tenn.R.Evid. 401.

**63.** Tenn.R.Evid. 402.

**64.** Tenn.R.Evid. 403.

**65.** 781 S.W.2d 277 (Tenn.Crim.App.), *per. app. denied* (Tenn.1989).

**66.** 781 S.W.2d at 287; *see State v. Gentry,* 881 S.W.2d 1, 6 (Tenn.Crim.App.1993), *per. app. denied* (Tenn.1994).

**67.** *State v. Williamson,* 919 S.W.2d 69, 78 (Tenn. Crim.App.1995).

**68.** *Williamson,* 919 S.W.2d at 78; *State v. Hill,* 885 S.W.2d 357, 361 (Tenn.Crim.App.), *per. app. denied* (Tenn.1994).

**69.** *Williamson,* 919 S.W.2d at 78; *Dulsworth,* 781 S.W.2d at 287.

**70.** *Williamson,* 919 S.W.2d at 79; *State v. Hayes,* 899 S.W.2d 175, 183 (Tenn.Crim.App.), *per. app. denied* (Tenn.1995).

these photographs far outweighed their prejudicial effect.

 A willingness to stipulate a fact does not prevent the State of Tennessee from admitting relevant, probative material into evidence. A stipulation requires the acquiescence of all parties to the litigation. The appellants do not contend and the record does not establish the state entered into a stipulation with the appellants. In short, an accused cannot marshal the evidence of the state by simply offering to stipulate to a fact for the purpose of barring the state from introducing admissible, demonstrative evidence the accused does not want the jury to see. In this case, the state was properly permitted to introduce the photographs notwithstanding the willingness of the appellants to stipulate the nature of the injuries sustained by the child-victim.

This issue is without merit.

## VII.

 Each appellant filed a motion for a bill of particulars. During the hearing on the motions, it was revealed the State of Tennessee had furnished the appellants with a copy of Rogers's preliminary hearing as well as the preliminary hearing of the victim's mother. In addition, the state furnished the appellants with a sworn statement taken from the victim's mother. The statement consists of 298 pages. The assistant district attorney general advised the trial court and defense counsel it would rely upon the testimony of the victim's mother and the testimony of a medical doctor, whose name had been given to defense counsel to establish the offense of rape of a child.

One of the defense lawyers stated during the hearing:

I'm just again seeking from the State what it is that they intend to prove to establish that my client had any sexual activity with [P.M., the victim] from—all they stated in the indictment was from the 13th of October through November the 26th. There's nothing that I have seen that suggests to me that they have the proof, and I'm just curious as to what it is that they intend to prove. And I'm seeking from them direction and location as to witnesses and what it is they're proving.

When it was revealed the state would rely upon the victim's mother and the doctor to establish the offense or rape of a child, the following colloquy took place:

THE COURT: I don't know anything else, Mr. Holloway, that the State has that they could give you about that.

MR. HOLLOWAY: Your Honor, that may very well answer it. That may be our bill of particulars.

MR. FLYNN: It could be.

MR. HOLLOWAY: If that's what the State is saying is their intention of proving.

In other words, counsel seemed satisfied they knew all of the facts the state knew regarding the offense of rape of the victim.

 The purpose of a bill of particulars is to provide the accused with sufficient information about the offense alleged in the indictment to permit the accused (a) to prepare a defense to the offense, (b) to avoid prejudicial surprise at trial, and (c) to enable the accused to preserve a plea of double jeopardy.[71] In *State v. Byrd,* the supreme court recognized that in most child sexual abuse cases the state is unable to offer the specific date when an alleged offense occurred.[72] Nevertheless, a trial court should require the state to furnish what information it may have in its possession concerning the time when the alleged offense was committed.[73] Descriptive information can narrow the time-frame of the offense alleged in the indictment.[74] When the state lacks information to narrow the time frame with descriptive references, an accused's conviction may be affirmed if it appears the defense of the

---

**71.** *State v. Byrd,* 820 S.W.2d 739, 741 (Tenn. 1991); *State v. Campbell,* 904 S.W.2d 608, 611 (Tenn.Crim.App.1995); *State v. Perkinson,* 867 S.W.2d 1, 5 (Tenn.Crim.App.1992), *per. app. denied* (Tenn.1993).

**72.** 820 S.W.2d at 741.

**73.** *Byrd,* 820 S.W.2d at 741; *see Campbell,* 904 S.W.2d at 611–12.

**74.** *Byrd,* 820 S.W.2d at 742.

accused was not hampered by the lack of specificity of the indictment.[75]

The record reflects the state gave the appellants all of the information it had. The statement given by the victim's mother gave the time intervals when the acts in question occurred. The appellants had the preliminary hearings afforded Rogers and the victim's mother. The indictment for attempted first degree murder limited the commission of the offense to a period between November 8, 1993 and November 26, 1993. The indictment for rape of a child limited the commission of the offense to a period between October 13, 1993 and November 26, 1993. This protected the appellants' double jeopardy rights. Given the information furnished, the appellants were not surprised by the evidence introduced by the state during the trial.

This issue is without merit.

### VIII.

Griffis and Rogers contend the trial court committed error of prejudicial dimensions by joining their respective prosecutions and trying them together. However, the issues have been waived. The record does not contain the hearing on the state's motion for joinder.

When a party seeks appellate review of an issue, the party has a duty to prepare a record which conveys a fair, accurate, and complete account of what transpired with respect to the issue presented for review.[76] When the record is incomplete and does not contain a transcript of the proceedings relevant to the issue presented for review, the appellate court is precluded from considering the issue.[77] Instead, the appellate court must conclusively presume the ruling of the trial court on the motion was correct.[78]

This Court parenthetically notes that if this issue was considered on the merits, the appellants would not be entitled to relief.

### IX.

 Griffis contends the trial court abused its discretion by denying his motion for change of venue. He argues there was extensive news coverage of the crimes in question and, as a result, he could not receive a fair trial in Maury County.

During voir dire examination the trial court asked the prospective jurors whether they had any knowledge of facts about the prosecution against Griffis and Rogers. When a prospective juror indicated he or she had read a newspaper article, heard an audio news account, or talked to someone who claimed to have personal knowledge of facts pertaining to the prosecution, and the prospective juror indicated he or she had formed an opinion regarding the guilt of the appellants, the trial court excused the prospective juror. The trial court made sure the remaining prospective jurors who had been exposed to news accounts, but had not formed an opinion, could set aside what each prospective juror had heard and decide the case on the facts introduced into evidence. Each prospective juror assured the trial court he or she could comply with the trial court's request.

 Whether the venue of a criminal case should be moved to another county due to pretrial publicity is a matter entrusted to the sound discretion of the trial court; and an appellate court will not interfere with the exercise of this discretion unless it is clear on the face of the record the trial court has

---

**75.** *Byrd,* 820 S.W.2d at 742; *State v. Anderson,* 748 S.W.2d 201, 204 (Tenn.Crim.App.), *per. app. denied* (Tenn.1985).

**76.** *State v. Ballard,* 855 S.W.2d 557, 560–61 (Tenn.1993); *State v. Zirkle,* 910 S.W.2d 874, 883 (Tenn.Crim.App.), *per. app. denied* (Tenn.1995); *State v. Richardson,* 875 S.W.2d 671, 674 (Tenn. Crim.App.1993), *per. app. denied* (Tenn.1994); *State v. Banes,* 874 S.W.2d 73, 82 (Tenn.Crim. App.1993), *per. app. denied* (Tenn.1994); *State v. Oody,* 823 S.W.2d 554, 558–59 (Tenn.Crim.App.),

*per. app. denied* (Tenn.1991); *State v. Roberts,* 755 S.W.2d 833, 836 (Tenn.Crim.App.), *per. app. denied* (Tenn.1988).

**77.** *Ballard,* 855 S.W.2d at 560–61; *Zirkle,* 910 S.W.2d at 884; *Richardson,* 875 S.W.2d at 674; *Banes,* 874 S.W.2d at 82; *Roberts,* 755 S.W.2d at 836.

**78.** *Richardson,* 875 S.W.2d at 674; *Oody,* 823 S.W.2d at 558–59; *Roberts,* 755 S.W.2d at 836.

abused its discretion.[79] Before an accused is entitled to a reversal of his or her conviction on this ground, it must be demonstrated to the appellate court the jurors who sat in judgment of the accused's guilt were biased and/or prejudiced against the accused.[80]

 Mere exposure of prospective jurors to newspaper accounts or audio news accounts of the crime does not, standing alone, establish that the jurors were biased or prejudiced against the appellant. Prospective jurors can be aware of facts regarding the prosecution against the accused and still be qualified to be selected as a juror who sits in judgment of the accused.[81] "The ultimate test is whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." [82] Nor did such exposure violate the appellant's right to a trial by a fair and impartial jury.[83] The appellant, being suspected of committing a serious crime, could not expect to remain anonymous in the community.[84]

Based upon this Court's review of the voir dire proceedings, the factors to be considered in determining whether the venue of a trial should be changed to another county,[85] the applicable rule,[86] and the body of common law which has developed through the years, this Court concludes the trial court did not abuse its discretion in denying Griffis's motion for a change of venue.[87] Rogers did not raise this issue on appeal. Moreover, the appellant has failed to establish the jurors were either biased or prejudiced against him.[88]

This issue is without merit.

## X.

During rebuttal argument, the assistant district attorney general told the jury:

You know, one thing for sure, when all is said and done in this case, and we all pack up and go home, and this is, that there's three people, and only three people, who know for sure, who are adults in this case, what happened to [PM].

These three people have to live with that, to the extent that this mother comes in here and she sits in this chair, and she will not, or cannot, or for some reason refuses to give us a full accounting of her actions

---

79. *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993), *cert. denied*, 510 U.S. 1215, 114 S.Ct., 1339, 127 L.Ed.2d 687; *State v. Smith*, 857 S.W.2d 1, 6 (Tenn.1993); *State v. Evans*, 838 S.W.2d 185, 191 (Tenn.1992), *cert. denied*, 510 U.S. 1064, 114 S.Ct. 740, 126 L.Ed.2d 702 (1994); *State v. Teel*, 793 S.W.2d 236, 246 (Tenn. 1990), *cert. denied* 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990); *State v. Hartman*, 703 S.W.2d 106, 113 (Tenn.1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3308, 92 L.Ed.2d 721 (1986); *State v. Zagorski*, 701 S.W.2d 808, 815 (Tenn.1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3309, 92 L.Ed.2d 722 (1986); *State v. Melson*, 638 S.W.2d 342, 360 (Tenn.1982), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983); *Adkins v. State*, 911 S.W.2d 334, 343 (Tenn.Crim.App.), *per. app. denied* (Tenn.1995); *State v. Raspberry*, 875 S.W.2d 678, 681 (Tenn. Crim.App.1993), *per. app. denied* (Tenn.1994); *State v. Burton*, 751 S.W.2d 440, 451–52 (Tenn. Crim.App.), *per. app. denied* (Tenn.1988).

80. *Melson*, 638 S.W.2d at 360–61; *Adkins*, 911 S.W.2d at 343; *Raspberry*, 875 S.W.2d at 681; *Burton*, 751 S.W.2d at 451; *State v. Browning*, 666 S.W.2d 80, 86 (Tenn.Crim.App.1983), *per. app. denied* (Tenn.1984); *Lackey v. State*, 578 S.W.2d 101, 104 (Tenn.Crim.App.1978), *cert. denied* (Tenn.1979).

81. *State v. Bates*, 804 S.W.2d 868, 877 (Tenn. 1991), *cert. denied*, 502 U.S. 841, 112 S.Ct. 131, 116 L.Ed.2d 98 (1991).

82. *State v. Kyger*, 787 S.W.2d 13, 18–19 (Tenn. Crim.App.1989), *per. app. denied* (Tenn.1990) (citing *State v. Garland*, 617 S.W.2d 176, 187 (Tenn.Crim.App.), *per. app. denied* (Tenn.1981)); *see also Raspberry*, 875 S.W.2d at 681.

83. *Murphy v. Florida*, 421 U.S. 794, 199–800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *Adkins*, 911 S.W.2d at 343; *Kyger*, 787 S.W.2d at 19.

84. *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977).

85. *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn. Crim.App.1979), *per. app. denied* (Tenn.1980); *see Adkins*, 911 S.W.2d at 343.

86. Tenn.R.Crim.P. 21.

87. *See Hartman*, 703 S.W.2d at 113; *Zagorski*, 701 S.W.2d at 815; *Hoover*, 594 S.W.2d at 746.

88. *State v. Van Tran*, 864 S.W.2d 465, 474 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 64 (Tenn. 1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *Evans*, 838 S.W.2d at 192; *Adkins*, 911 S.W.2d at 343; *Raspberry*, 875 S.W.2d at 681.

in that trailer number 12. That puts that mother, and it's hard to refer to a person as a mother in those terms of this little four year old child, but that puts that person on the same level as these two evil, despicable, human beings sitting on the other side of this courtroom.

MR. HOLLOWAY: Your Honor, I object to those connotations being applied to the defendants. The General knows that's inappropriate.

THE COURT: All right. Well, as I'll mention to you later, lady and gentlemen of the jury, the statements of the attorneys are not evidence and you won't treat it as evidence. Go ahead.

The trial court gave the following instruction in the charge given to the jury:

Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them.

The appellants contend the name-calling by the assistant district attorney general constitutes reversible error. The substance of their respective arguments are two-fold. First, the adjectives used to describe the appellants were so prejudicial it influenced the verdict of the jury. Second, the trial court failed to reprimand the assistant district attorney general or give an appropriate curative instruction.

### A.

 In this state's adversarial system of justice, both the district attorney general and defense counsel are advocates; and both counsel are entitled to make proper oratorical emphasis regarding their respective theories of the case. Counsel for the parties are to be afforded great latitude in expressing their respective views to the jury.

 The district attorney general is a "quasi-judicial officer," who represents the state in criminal prosecutions.[89] However, it is as much the district attorney general's responsibility to enforce the laws as it is to see the accused receives a fair and impartial trial.[90] The district attorney general is "presumed to act impartially in the interest only of justice."[91] A district attorney general must remember his or her words "especially in concluding arguments, often have great weight with juries."[92] In *Berger v. United States*,[93] the United States Supreme Court, commenting upon the obligation of a prosecutor, stated:

[T]he [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interests, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the ac-

**89.** *Knight v. State,* 190 Tenn. 326, 332, 229 S.W.2d 501, 503 (1950); *Watkins v. State,* 140 Tenn. 1, 10, 203 S.W. 344, 346 (1918).

**90.** *Burlison v. State,* 501 S.W.2d 801, 806 (Tenn. 1973) (the district attorney general has a corresponding duty along with the trial court to see that the fundamental right to a fair and impartial trial is accorded to the accused); *Turner v. State,* 72 Tenn. 206, 210 (Tenn.1879).

**91.** *Knight,* 190 Tenn. at 332, 229 S.W.2d at 503; *Watkins,* 140 Tenn. at 10, 203 S.W. at 346.

**92.** *Turner,* 72 Tenn. at 210; *see Knight, supra.*

**93.** 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)(cited with approval in *Judge v. State,* 539 S.W.2d 340, 344–45 (Tenn.Crim.App.1976)).

cused when they should properly carry none.[94]

This Court must now determine the question of name calling by the assistant district attorney general.

### B.

 The argument of an advocate must be temperate, predicated upon evidence introduced during the trial, and pertinent to the issues which must be resolved by the jurors.[95] Advocates should refrain from name calling.[96] It was improper for the assistant district attorney general to refer to Griffis and Rogers as "evil, despicable human beings."

This Court can understand and appreciate why the assistant district attorney general harbored such feelings for the appellants. It was a hard-fought trial. The jury found the appellants guilty of serious crimes based upon conduct which could trigger such comments from any person who heard the evidence adduced at the trial or had knowledge of the facts. Nevertheless, this does not authorize an assistant district attorney general to relate the feelings he or she may harbor towards the accused to the jury.

### C.

 When an advocate reverts to improper argument, it is incumbent upon adversary counsel to impose a contemporaneous objection so the trial court may be afforded the opportunity to correct the error. In this case, counsel for Griffis interposed an objection. While the record does not reflect Rogers made a contemporaneous objection, this Court will consider her issue.

 A trial court should give a curative instruction once an objection has been made. If the trial court fails to give a curative instruction *sua sponte*, counsel has the obligation to request the trial court to give a curative instruction.[97] If a party fails to request a curative instruction, or, if dissatisfied with the instruction given and does not request a more complete instruction, the party effectively waives the issue for appellate purposes.[98] In this case, the appellants seemed satisfied with the trial court's statement to the jury. Neither appellant asked the trial court to give a more detailed curative instruction to the jury. Consequently, this portion of the issue has been waived.

### D.

 While the descriptive terms used by the assistant district attorney general were improper, such comment does not constitute reversible error. The statement was short; an objection was immediately registered; and the trial court addressed the jury regarding the matter. No further request was made for a more detailed instruction. This Court is of the opinion the statement of the assistant district attorney general constituted harmless error.[99] The evidence of the appellants' guilt is overwhelming. Moreover, this brief commentary could not have prejudiced the appellants in the eyes of the jury given the graphic evidence of what happened to the child-victim and the medical testimony regarding the effect of the injuries to her.

**94.** 295 U.S. at 88, 55 S.Ct. at 633, 79 L.Ed. at 1321.

**95.** *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978); *State v. Tyson*, 603 S.W.2d 748, 754 (Tenn.Crim.App.), *per. app. denied* (Tenn.1980); *Sparks v. State*, 563 S.W.2d 564, 569 (Tenn.Crim. App.), *cert. denied* (Tenn.1978).

**96.** *Hiller v. State*, 164 Tenn. 388, 50 S.W.2d 225 (1932); *State v. Stapleton*, 638 S.W.2d 850, 857 (Tenn.Crim.App.), *per. app. denied* (Tenn.1982); *State v. Robinson*, 622 S.W.2d 62, 72 (Tenn.Crim. App.1980); *Tyson*, 603 S.W.2d at 754.

**97.** Tenn.R.App.P. 36(a); *State v. Philpott*, 882 S.W.2d 394, 404 (Tenn.Crim.App.), *per. app. denied* (Tenn.1994); *State v. Peat*, 790 S.W.2d 547, 551 (Tenn.Crim.App.), *per. app. denied* (Tenn. 1990); *State v. Jones*, 733 S.W.2d 517, 522 (Tenn.Crim.App.), *per. app. denied* (Tenn.1987); *State v. Mackey*, 638 S.W.2d 830, 835–36 (Tenn. Crim.App.), *per. app. denied* (Tenn.1982).

**98.** *Peat*, 790 S.W.2d at 551; *State v. Leach*, 684 S.W.2d 655, 658 (Tenn.Crim.App.1984); *per. app. denied* (Tenn.1985); *Mackey*, 638 S.W.2d at 836.

**99.** Tenn.R.App.P. 36(b).

## XI.

### A.

Both appellants challenge the length of the sentences imposed by the trial court and the manner they are to serve their respective sentences. Both Griffis and Rogers contend the sentences were (a) unfair, harsh, and disparate when compared to the sentence of Mitchell, (b) unduly severe because the evidence was insufficient to support the sentences, and (c) improperly imposed because the trial court failed to closely scrutinize the application of the enhancement factors.

When an accused challenges the length and manner of service of a sentence, it is the duty of this Court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." [100] This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." [101] The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts.[102] However, this Court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is based upon the witnesses' demeanor and appearance.

In conducting a *de novo* review of a sentence, this Court must consider (a) the evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancing factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment.[103]

When the accused is the appellant, the accused has the burden of establishing that the sentence imposed by the trial court was erroneous.[104]

### B.

The trial court found as a mitigating fact that neither appellant had a criminal record except for Griffis who had a prior traffic offense. The court found the following enhancement factors:

(a) Defendant was a leader in the commission of the crime; [105]

(b) The victim of the offense was particularly vulnerable because of age or physical or mental disability; [106]

(c) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; [107]

(d) The personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great; [108]

(e) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement; [109]

(f) The defendant had no hesitation about committing a crime when the risk to human life was high; [110] and

---

100. Tenn.Code Ann. § 40–35–401(d).

101. *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn. 1991).

102. *State v. Butler,* 900 S.W.2d 305, 311 (Tenn. Crim.App.1994); *State v. Smith,* 891 S.W.2d 922, 929 (Tenn.Crim.App.), *per. app. denied* (Tenn. 1994); *State v. Bonestel,* 871 S.W.2d 163, 166 (Tenn.Crim.App.1993).

103. Tenn.Code Ann. §§ 40–35–103 and –210; *State v. Scott,* 735 S.W.2d 825, 829 (Tenn.Crim. App.), *per. app. denied* (Tenn.1987).

104. Sentencing Commission Comments to Tenn. Code Ann. § 40–35–401; *Ashby,* 823 S.W.2d at 169; *Butler,* 900 S.W.2d at 311.

105. Tenn.Code Ann. § 40–35–114(2).

106. Tenn.Code Ann. § 40–35–114(4).

107. Tenn.Code Ann. § 40–35–114(5).

108. Tenn.Code Ann. § 40–35–114(6).

109. Tenn.Code Ann. § 40–35–114(7).

110. Tenn.Code Ann. § 40–35–114(10).

(g) During the commission of the felony, the defendant willfully inflicted bodily injury upon another person or the actions of the defendant resulted in the death of or serious bodily injury to a victim or a person other than the intended victim.[111]

As previously noted, the trial court specified the enhancement factors that were applied in determining the length of the sentences, but the court failed to specify which enhancement factors applied to which offense. Thus, the statutory presumption of correctness afforded by Tenn.Code Ann. § 40–35–401(d) does not apply.[112] This Court will address each enhancement factor without a presumption of correctness.

### (1)

**■** Both Griffis and Rogers were leaders in the offense of attempting to commit murder in the first degree.[113] They continually exercised influence over Mitchell. They convinced Mitchell to move to Tennessee with her two children. Later, they convinced Mitchell to leave a Nashville mission and bring her two children to live with them in a Columbia trailer park. It was Griffis and Rogers who told Mitchell they would like to cremate the child-victim. Griffis obtained the paddle used to beat the child-victim. Rogers used her belt. In summary, Griffis and Rogers were the leaders in this offense. However, this enhancement factor does not apply to the child rape conviction since Mitchell did not participate in this offense.

### (2)

**■** The child-victim, who was four years of age, was particularly vulnerable.[114] She was at the mercy of three adults. Within a short period of time the child was almost lifeless due to the multiple beatings, the burning of her body, the pouring of scalding water upon her, and numerous other acts of cruelty. She was powerless to call for assistance. Her own mother was a party to the conspiracy to inflict harm upon her.

In a recent case, the supreme court has ruled this enhancement factor can be used in like or similar circumstances.[115] In *State v. Kissinger*, the supreme court said:

> In *State v. Adams*, 864 S.W.2d 31 (Tenn. 1993), we held that although age is an element of the offense of aggravated rape, involving a child under the age of thirteen, factor (4) may be used if "circumstances show that the victim, because of [the victim's] age or physical or mental condition, was in fact, particularly vulnerable." *State v. Adams*, 864 S.W.2d at 35. Thus, the factor may be used to enhance sentences when a victim's natural physical and mental limitations renders the victim particularly vulnerable for his or her age because of the inability to resist, a difficulty in calling for help, or a difficulty in testifying against the perpetrator. *State v. Hayes*, 899 S.W.2d 175, 185 (Tenn.Crim.App.), *per. app. denied* (Tenn.1995).

> This rational applies to aggravated sexual battery convictions involving a victim under the age of thirteen as well.[116]

This enhancement factor clearly applies in this case. It is applicable to both offenses in each case.

### (3)

**■** The appellants clearly treated the child-victim with extreme cruelty.[117] The phrase "extreme cruelty" is defined as "cruelty above that needed to effectuate the crime." [118] The infliction of injuries far exceeds the acts necessary to effectuate the

---

111. Tenn.Code Ann. § 40–35–114(12).

112. *See State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991); *State v. Embry*, 915 S.W.2d 451, 455 (Tenn.Crim.App.1995), *per. app. denied* (Tenn.1996).

113. Tenn.Code Ann. § 40–35–114(2).

114. Tenn.Code Ann. § 40–35–114(4).

115. *State v. Kissinger*, 922 S.W.2d 482 (Tenn. 1996); *see also State v. Melvin*, 913 S.W.2d 195,

202–03 (Tenn.Crim.App.), *per. app. denied* (Tenn. 1995).

116. 922 S.W.2d at 487.

117. Tenn.Code Ann. § 40–35–114(5).

118. *State v. Lester Bennett*, Sevier County No. 03–C–01–9403–CR–00104, 1994 WL 683373 (Tenn.Crim.App., Knoxville, December 8, 1994).

offense of attempt to commit murder in the first degree. Holding a child against a heater, pouring alcohol and peroxide on the open wounds to see her "dance," pouring scalding water on the child-victim while she was in a bathtub, beating her with a board, and hanging her from a coat hook qualify as acts of exceptional cruelty.

The facts do not support the use of this factor to enhance the sentence for child rape.

#### (4)

Factor (6) states "the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great." [119]

Contrary to what the appellants allege, injury is not an element of attempted first degree murder. Here, the injuries to the child were particularly great. The child was beaten and burned. Repairing the child's burned areas required taking skin grafts from other parts of the child's body. Her injuries and treatment required hospitalization. The enhancement of the sentences because of the injuries was proper. [120]

As for the use of factor (6) to enhance the sentence for rape of a child, this Court finds that it was also appropriate. The child's genital examination was described as "normal" except for the scarring from a hot liquid burn to the area. The medical testimony indicated that the four-year-old had a "rather large fissure" at her anal opening. This resulted from a "forceful stretching of this area" according to one of the child's treating doctors at Vanderbilt. Dr. Robert Braden, a specialist in detecting child sexual abuse, said this was one of the largest tears he had seen. The presence of injury has been used as an enhancing factor in other cases when vaginal and rectal injuries occurred during rape. [121] This Court has noted that while all forcible rapes involve a degree of trauma to the victim, the crime varies. Personal injury to a rape victim, exceeding the trauma minimally a part of any forcible rape, is a proper enhancement factor. [122] The Tennessee Supreme Court said in *Kissinger* that this factor can be applied in a rape case as long as the showing is made that the injuries were "particularly great." [123]

#### (5)

The appellants engaged in both criminal acts due to their desire for gratification or pleasure and excitement. [124] In the child rape conviction, both of the appellants were in bed with the child-victim. Her clothing had been removed. Rogers digitally penetrated the victim. Griffis had his reproductive organ near the child's face. He then placed himself in a position to penetrate the child-victim as Rogers lay beside the victim. On other occasions, Rogers took baths with the victim. She digitally penetrated the victim during the course of the baths. Given these circumstances, the sentence in the child rape case was properly enhanced based on this factor. [125]

It is apparent from the record this factor should apply in the attempt to commit murder in the first degree. The appellants both beat the victim, and took turns burning her

**119.** Tenn.Code Ann. § 40–35–114(6).

**120.** *See State v. Ray Armstrong,* Maury County No. 01–C–01–9407–CC–00260, 1995 WL 316288 (Tenn.Crim.App., Nashville, May 25, 1995), *per. app. denied* (Tenn.1995) (factor (6) appropriate when victim was shot twice in the back and hospitalized for two weeks in intensive care); *State v. Richard Wayne Otey,* Williamson County No. 01–C–01–9409–CC–00316, 1995 WL 687698 (Tenn.Crim.App., Nashville, November 21, 1995), *per. app. denied* (Tenn.1996).

**121.** *State v. Donald Wayne Holt,* Rutherford County No. 01–C–01–9503–CC–00053, 1995 WL 571925 (Tenn.Crim.App., Nashville, September 27, 1995), *per. app. denied concurring in results only* (Tenn.1996); *State v. Randy Strange,* Jefferson County No. 94, 1991 WL 51408 (Tenn.Crim. App., Knoxville, April 11, 1991), *per. app. denied* (Tenn.1991).

**122.** *State v. Rex Allen Ferguson* Knox County No. 03–C–01–9212–CR–00439, 1993 WL 147447 (Tenn.Crim.App., Knoxville, May 7, 1993), *per. app. denied* (Tenn.1993); *see also State v. Hammons,* 737 S.W.2d 549, 554–55 (Tenn.Crim.App.), *per. app. denied* (Tenn.1987).

**123.** *Kissinger,* 922 S.W.2d at 488.

**124.** Tenn.Code Ann. § 40–35–114(7).

**125.** *See Kissinger,* 922 S.W.2d at 489–90; *State v. Adams,* 864 S.W.2d 31, 35 (Tenn.1993).

by placing her against an open heater. Thereafter, the appellants poured alcohol and peroxide on the child-victim's injured body to see her "dance" like a "funky chicken." Scalding water was poured over the child, and her fingers and forehead were burned. In summary, the appellants were clearly performing some form of perverted child abuse which amused them and which they enjoyed.

#### (6)

■ Enhancement factor (10)[126] is not applicable based upon the facts of this case. While these criminal actions created severe risks to the child-victim's life, this factor is inherent in both offenses. This Court has consistently ruled the risk must be to a third party in cases of this nature before this factor is applicable.[127]

#### (7)

The State of Tennessee properly concedes the trial court should not have enhanced the appellants' sentence pursuant to enhancement factor (12).[128]

#### (8)

■ The appellants also violated or breached a position of private trust.[129] This was not considered by the trial court. Both of the appellants lived with the child-victim. They provided the child with food. Rogers and Mitchell begged for food and gasoline from area churches. Griffis worked as a security guard to earn enough money to pay the rent and purchase groceries. Rogers stated she was concerned with the safety and welfare of the Mitchell children. Rogers bathed the child-victim. Griffis and Rogers told the child when it was time for bed and took turns "disciplining" the child. In short, the appellants were extended parents to the child-victim, and this created the position of trust which was violated.

■ The existence of a position of trust "does not depend on the length or the formality of the relationship."[130] Instead, the court "should look to see whether the offender formally and informally stood in a relationship to the victim that promoted confidence, reliability, or faith."[131]

This factor should have been used to enhance both sentences.

### C.

■ The trial court ordered the sentences imposed are to be served consecutively. The appellants contend they were not proper candidates for consecutive sentencing. Furthermore, the service of the sentences consecutively is excessive. The trial court found the appellants were dangerous offenders within the meaning of Tenn.Code Ann. § 40–35–115(b)(4).

An accused qualifies as a dangerous offender when his or her "behavior indicates little or no regard for human life, and [he or she has] no hesitation about committing a crime in which the risk to human life is high."[132] While both appellants qualify as dangerous offenders, this fact, standing alone, will not justify consecutive sentencing.[133] As the supreme court said in *Wilkerson:*

> As previously stated in this opinion, the imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably re-

---

**126.** Tenn.Code Ann. § 40–35–114(10).

**127.** *State v. Makoka*, 885 S.W.2d 366, 373 (Tenn. Crim.App.), *per. app. denied* (Tenn.1994).

**128.** Tenn.Code Ann. § 40–35–114(12).

**129.** Tenn.Code Ann. § 40–35–114(15).

**130.** *Kissinger*, 922 S.W.2d at 488.

**131.** *Kissinger*, 922 S.W.2d at 488.

**132.** Tenn.Code Ann. § 40–35–115(b)(4); *see Gray v. State*, 538 S.W.2d 391, 393 (Tenn.1976).

**133.** *State v. Wilkerson*, 905 S.W.2d 933, 938–39 (Tenn.1995); *see State v. Taylor*, 739 S.W.2d 227 (Tenn.1987); *Gray*, 538 S.W.2d at 393; *State v. Woods*, 814 S.W.2d 378, 380 (Tenn.Crim.App.), *per. app. denied* (Tenn.1991).

late to the severity of the offenses committed.[134]

The nature of the injuries inflicted to the child-victim, the methods used to inflict the injuries, the intentional mistreatment of the child-victim for their personal gratification and enjoyment, and the condition of the child-victim when she reached the emergency room of the local hospital and intensive care unit of Vanderbilt University Medical Center clearly establish the callousness of the appellants toward the life of a child. Most people in the world would have a hard time believing residents of a civilized nation would engage in such conduct.

This Court is of the opinion consecutive sentences should be imposed to prevent the appellants from individually or jointly harming another young child as they did in this case. Moreover, the lengths of the sentences imposed are commensurate with the crimes the appellants committed as hereinabove set forth.

### D.

 The appellants contend they should have received the same sentence as Mitchell, namely twenty-three (23) years for the offense of attempting to commit murder in the first degree. They argue the disparity in their respective sentences violated their constitutional rights.

Each person convicted of a crime must be sentenced based upon the facts and circumstances contained in the record. In this case, the appellants sexually abused the child-victim. This abuse resulted in a severe injury near the anal opening. Mitchell was not convicted of sexually abusing the child-victim. Nor was Mitchell accused of placing the child-victim against the open heater and severely burning the victim. Rogers used a belt to beat the child-victim while Griffis used a "paddle" to beat her. It was Griffis and Rogers who stated they wanted to cremate the child-victim. Their criminal actions would have resulted in the death of the child-victim had it not been for a neighbor who saw the child and called the police. It was

this act of concern and kindness by the neighbor which saved the child-victim's life.

Given these circumstances, there is no disparity in the sentences, and the appellants' constitutional rights have not been violated by the length of the sentences imposed by the trial court.

### E.

This Court is of the opinion the sentences imposed are justified given the number of enhancement factors established by the evidence, the circumstances of the offenses, and the remaining factors which this Court must consider in conducting a *de novo* review. The fact of the enhancement factors used by the trial court should not have been considered does not equate with a reduction of the sentences.[135] The length of the sentences and the manner of how the sentences are to be served are affirmed.

PEAY, J., concurs and dissents in part.

JOSEPH H. WALKER, III, Special Judge, concurs.

---

**134.** 905 S.W.2d at 939.

